# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| Julia Garrett, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **Civil Action No. 1:18-cv-61** |
| | § | |
| General Motors LLC, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S COMPLAINT

**To the Honorable United States Judge of Said Court:**

COMES NOW, Julia Garrett (hereinafter referred to as "Plaintiff"), and respectfully files this Complaint against General Motors LLC (hereinafter referred to as "Defendant"), and in support hereof would state and show the following:

## I. Parties

1.    Plaintiff Julia Garrett is the biological mother of Stepheni Cooney-James, deceased. She resides in and is a citizen of Austin, Texas.

2.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business in Michigan. Its sole member is General Motors Holdings LLC, a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in the Michigan. Service

of process upon this Defendant may be had by serving its registered agent for service,

Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at

211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

## II. Subject Matter Jurisdiction

3.    This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C.

Section 1332.

4.    The parties to this lawsuit are citizens of different states, and the matter in

controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## III. Venue

5.    The accident in question occurred in Travis County, which falls in the West-

ern District of Texas, Austin Division.

## IV. Facts

6.    On or about July 31, 2017, Stepheni Cooney-James was driving a 2015 Chev-

rolet Traverse (VIN# KL7CJKSB3FB179777)("subject vehicle") traveling southbound

on Cameron Road in Travis County, Texas.

7.    The subject vehicle was designed by Defendant.

8.    The subject vehicle was manufactured by Defendant.

9.    The subject vehicle was distributed by Defendant.

10.    The subject vehicle was also assembled and tested by Defendant.

11.    Control of the subject vehicle was lost, striking several trees before catching

on fire.

12.   At the time of the accident, Stepheni Cooney-James was properly seated and properly wearing the available seat belt.

13.   However, Stepheni Cooney-James sustained fatal injuries during the accident sequence because her vehicle failed to protect her due to violating several crashworthiness principles.

14.   There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

1.   Maintain survival space;

2.   Provide proper restraint throughout the entire accident;

3.   Prevent ejection;

4.   Distribute and channel energy; and

5.   Prevent post-crash fires.

15.   When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

16.   The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from

crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

17.    Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails.

18.    Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

19.    Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

20.    Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

21.    General Motors has stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

22.    Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

23.    Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are

basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

24.    It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

25.    In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

26.    This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

27.    Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

28.    Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

29.    Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

30.    Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

31.    Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

## V. Cause(s) of Action as to Defendant

32.   It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

33.   The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

34.   Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

35.   As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

36.   Defendant either knew or should have known of at least one safer alternative design which would have prevented the fatal injuries to Stepheni Cooney-James.

37.   In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

a.   The vehicle failed to provide occupant protection during a fore-
     seeable accident;

b.   The vehicle failed to provide reasonable safety during a foresee-
     able accident;

c.   The vehicle failed to provide reasonable crashworthiness;

d.   The vehicle failed to allow the vehicle's safety systems to be ef-
     fective;

e.   The vehicle violated principles of crashworthiness;

f.   The vehicle experienced a Post Collision Fuel Fed Fire
     ("PCFFF");

g.   The PCFFF occurred because the fuel tank was breached;

h.   The PCFFF occurred because the fuel lines separated;

i.   The PCFFF occurred because the fuel delivery system failed to
     utilize safer alternative designs such as quick disconnect sys-
     tems, fuel bladders, fuel cells, shut off switches; and/or

j.   The PCFFF occurred because the fuel system was not properly
     shielded, guarded, and/or protected.

38.   Defendant further failed to conduct proper testing and engineering analysis
during the design, development and testing of the vehicle.

39.   Defendant was further negligent in the manufacture, assembly, marketing,
and/or testing of the vehicle in question.

40.   As noted earlier, most (if not all) engineering associations in the United
States (and around the world) have a code of ethics. The number 1 fundamental canon
of ethics for almost all engineers is to "hold paramount the safety, health, and welfare
of the public."

41.   Accordingly, since paramount means "superior to all others", all vehicle en-
gineers have to hold the safety, health, and welfare of the public as their highest
considerations when they design vehicles. Indeed, General Motors has admitted that
its engineers have to hold paramount the safety, health, and welfare of the public.

42.    However, Defendant General Motors failed to conduct proper testing and engineering analysis during the design, development, and/or testing of the vehicle.

43.    In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death. General Motors has admitted this in sworn testimony.

44.    Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

45.    If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

46.    If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

47.    A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

48.    Based upon information and/or belief, the subject vehicle was not subjected to rigorous engineering analysis.

49.    Based upon information and/or belief, the subject vehicle was not properly tested to evaluate underbody intrusion into the fuel system.

50.    Based upon information and/or belief, the subject vehicle was not subjected to FEM, FEA, or finite modeling to evaluate different designs and material.

51.    Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

52.    When General Motors designed the subject vehicle, it did not reinvent the wheel. General Motors used (or should have used) an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicles. This knowledge would have been (or should have been) utilized in different aspects of the designs of the vehicle to make the vehicle safer in foreseeable accidents.

53.    Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

54.    However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

55.    Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendant knew, when it knew it, and about what was utilized or not utilized as well as the reasons why.

56.    The foregoing acts and/or omissions, defects, and/or negligence of Defendant were the producing, direct, proximate, and/or legal cause of Stepheni Cooney-James' fatal injuries, and Plaintiff's damages.

## VI. Damages to Plaintiff

57.    As a result of the acts and/or omissions of Defendant, Plaintiff has suffered

past and future; loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, loss of companionship and society, loss of consortium, and mental anguish as a result of the death of Stepheni Cooney-James.

58.    As a result of the acts and/or omissions of Defendant, Plaintiff has become obligated to pay reasonable and necessary funeral and burial expenses as a result of the fatal injuries to Stepheni Cooney-James.

59.    The above and foregoing acts and/or omissions of the Defendant, resulting in the fatal injuries to Stepheni Cooney-James, have caused actual damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

## VII. Jury Demand

60.    Plaintiff asserts her rights under the Seventh Amendment to the U.S. Constitution and respectfully demand, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## VIII. Prayer

61.    For the reasons presented herein, Plaintiff prays that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recovers judgment against Defendant for:

  a.  actual damages;
  b.  prejudgment and post-judgment interest beginning July 31, 2017;
  c.  costs of suit; and
  d.  all other relief, general and special, to which Plaintiff is entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**

  /s/ E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
EToddTracy@vehiclesafetyfirm.com
Stewart D. Matthews
State Bar No. 24039042
SMatthews@vehiclesafetyfirm.com
Andrew G. Counts
State Bar No. 24036408
ACounts@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas  75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiff**